NUMBER 13-01-619-CR
 
COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG




RAFAEL ELIZONDO,                                                                   Appellant,

v.

THE STATE OF TEXAS,                                                                Appellee.




On appeal from the 103rd District Court
of Willacy County, Texas.




MEMORANDUM OPINION




Before Justices Yañez, Castillo and Garza
Memorandum Opinion by Justice Castillo

          A jury convicted appellant Rafael Elizondo of murder and aggravated assault with
a deadly weapon. The trial court assessed punishment at twenty-five years' confinement
in the Institutional Division of the Texas Department of Criminal Justice. We affirm.
I. ISSUES PRESENTED
          By his first and second issues, Elizondo asserts that the evidence is legally and
factually insufficient to sustain his convictions. By his third and fourth issues, he asserts
the trial court erred by not timely complying with the mandates in articles 38.22 and 38.30
of the Texas Code of Criminal Procedure. By his fifth issue, Elizondo challenges the trial
court’s refusal to exclude a State's witness from the courtroom. By his sixth issue,
Elizondo asserts the trial court abused its discretion in excluding an autopsy photograph. 
Finally, by his seventh issue, Elizondo asserts the trial court abused its discretion by
refusing him a new trial.
II. RELEVANT FACTS
          On August 5, 2000, in the 900 block of West Tampico Street in Raymondville, a
residential area, Elizondo shot and killed Pablo Garcia and shot Garcia’s wife, Guadalupe
Gallardo Garcia (“Gallardo”). Two indictments charged Elizondo with the offenses of: (1) 
murder;


 (2) aggravated assault with a deadly weapon;


 and (3) conspiracy to commit
murder.


 Anna Luisa Martinez (“Martinez”)


 was indicted for conspiracy to commit 
aggravated assault but was acquitted. Elizondo and Martinez were tried together. 
A. The Shooting of Garcia and Gallardo
          By August 5, 2000, Martinez and Elizondo had been living together for about eight
months. The two considered themselves married under the common law, but evidence at
trial showed Martinez remained married to another man. Martinez, pregnant at the time,
had her baby son with her at their residence on Norman Street. Her two daughters had
spent the night at the home of her sister, Maria Carbajal, at 925 West Tampico. Elizondo
was working and supporting the family. 
          The night before the shooting, Martinez and Elizondo received two calls between
two and three o’clock in the morning. Elizondo told Martinez that one of the calls was from
his sister, Angela De Los Santos, and the other from Fernando Chihuahua, whose
nickname was “Little Man.” Chihuahua had called from the residence of Carlos Salazar. 
According to Martinez, Elizondo, Chihuahua and Salazar were members of the same
cadre. Martinez asked Elizondo if the callers waited until she fell asleep to phone, and he
laughed in response. She asked him nothing more about the calls. On the day of the
shooting, Martinez and Elizondo arose at about seven o’clock in the morning. Elizondo
watched television and drank a twenty-four ounce can of beer. Martinez noticed that
Elizondo had consumed most of the case of beer he had purchased the preceding day. 
          At about 10:45 a.m. on the same day, Elizondo and Martinez left their residence.
The two planned to pick up Martinez's daughters, shop for school clothes for the older
child, and have a picnic. On their way to Tampico Street to pick up the children, they
traveled a route calculated to avoid passing in front of the residence of Garcia and Gallardo
in the 800 block of West Tampico, three or four houses away from their destination. 
According to Martinez, they were trying to avoid a fight between Garcia and Elizondo 
because Garcia had told different people he was going to kill Elizondo “like a dog in the
street.” Martinez previously heard Garcia say he was going to “get anyone who was
around” Elizondo and did not care if children were hurt. Aware of the threats, Elizondo told
Martinez that Garcia was going to kill him. Elizondo and Martinez had taken the long way
to her sister’s house about ten times since May 2000, when the conflict between Garcia
and Elizondo began. As they drove onto Tampico Street, Martinez noticed a dark-colored
truck in front of Garcia’s house. Garcia was standing on the passenger side near the truck
bed, and seemed to be talking to another man standing nearby. Martinez was scared and
told Elizondo, “[Garcia] is out there.” Elizondo told her to hurry and get the girls. They
pulled into her sister’s driveway, afraid to park in the street because they did not want
Garcia to see them. Elizondo exited the car, went around the rear of the car, and tried to
open the door for Martinez, as the passenger side door was broken. Martinez looked back
and saw Garcia running down the street toward them with a tire tool in his left hand.


 
According to Martinez’s testimony at trial, Garcia also had a black gun with him, though she
did not remember in which hand.


 Gallardo, Garcia's wife, was with Garcia. Afraid Garcia
would hurt her and her baby, Martinez panicked and tried to open her passenger side door
but could not. Instead, she reached into the back seat and, without unbuckling the seatbelt
holding him, removed her son from his car seat. Meanwhile, Elizondo was at the
passenger side door trying to open it and “yelled” at Martinez for making “him go open the
passenger door.” Martinez ran toward the house when she saw Garcia and Gallardo still
running toward them. She heard Garcia saying, in Spanish, he was going to kill Elizondo
like a dog and did not want Elizondo on his street. She heard Gallardo tell Garcia to kill
Elizondo. Martinez told them, “Leave us alone.” When she was halfway into the house,
Martinez heard four or five consecutive shots. They were quick–one right after the other. 
She did not hear Elizondo say anything before the shooting. When she walked out of the
house, she saw Garcia run back, collapse, and drop the tire iron. She saw Gallardo grab
her neck, run, and fall down near Garcia. Elizondo was sitting in the driver's seat of the
car. 
          Still carrying her son, Martinez tried to remove the diaper bag from the back seat of
the car, because the bag contained her money. Elizondo asked her if she was staying or
leaving. Scared, she left with him, taking her baby. In the car, Elizondo said, “I told him,
I told him, he came at us; hey baby I just wanted to get my girls.” He repeatedly said he
messed up. According to Martinez, Elizondo has since cried, said he did not mean to do
it, and said he regretted his actions. 
          Martinez admitted she left her two daughters behind with her twelve-year-old niece,
V.C., without thinking about whether they were in danger. Leaving Tampico Street,
Elizondo and Martinez took the same route they traveled before and left town, stopping
along the way at a convenience store to buy beer and snacks. Later that afternoon,
Elizondo left her at their residence.


 Martinez was arrested later that night.
          Martinez’s twelve-year-old niece, V.C.,


 was at home with Martinez’s daughters on
August 5, 2000. V.C. was in her room looking out her bedroom window, waiting for her
parents who had gone to Wal-Mart. The window faces Tampico Street. V.C. saw
Elizondo’s car pull up; she saw Martinez and her son with him. She saw Garcia walking
toward Elizondo’s car with a tire tool in his hand and “something else.” Garcia was not
doing anything with the tire tool. She heard him say he was going to kill Elizondo “like a
dog in the street” and did not hear anyone else say anything. She testified Garcia was “a
little bit away” from Elizondo.


 V.C. saw Gallardo but did not remember seeing Elizondo
when she heard shots fired. Garcia turned around, walked a couple of steps, and fell. The
tire tool remained in his hand until he fell. When shown the diagram admitted in evidence
depicting where Garcia fell, V.C. testified the distance would be far from her residence. 
V.C. did not see Gallardo after the shooting. V.C. ran outside the house and saw Garcia
lying on the street. A couple of people approached Garcia to check his pulse to see if he
was alive. She saw Rudy Chavez, a neighbor, approach Garcia’s body, take something
away from him, and run home.


 She did not remember if Chavez tried to cover what he
took. She recalled he did not take the shiny object but took the dark object in Garcia’s
waistband. V.C. admitted she could not see whether the object was a gun.


 
          Gallardo testified that she arose about 10 o’clock on the morning of August 5, 2000. 
Garcia was engaged in various activities, including washing clothes and watering plants
outside, making breakfast, and getting ready to go to work. For about twenty minutes,
Garcia spoke with Jose Cortinas about work and fixing a car that belonged to Garcia’s
sister. According to Gallardo, Garcia said he needed tools for tires and brakes to fix the
car. Gallardo asked Garcia to eat breakfast with her because they usually ate together. 
Gallardo then heard neighbor Rudy Chavez say that Elizondo was "out there." According
to Gallardo, Garcia was going to see exactly where Elizondo was and “already had the tire
tool.” Knowing “things had happened already,” Gallardo went after Garcia, telling him to
go home because “they said that Elizondo was after my husband; it was for me to prevent
anything from happening.” She had that feeling because of what had happened in the
past, and knew that Elizondo and Garcia did not like each other. As Garcia was “going to
where Elizondo was,” Gallardo followed him about a house length behind. Gallardo saw
Elizondo standing close to the street and saw him pull out a gun. She testified that she
heard Garcia say in Spanish, “clean hands,” and that Elizondo yelled back at Garcia that
he was not going to fight with "clean hands."


 The prosecutor then asked Gallardo if she
saw the gun pointed at her, she testified she saw Elizondo pick up the weapon and heard 
her husband say “clean hands.” Garcia grabbed her and turned her around. As she
looked back to make sure Garcia was behind her, she saw Elizondo holding the gun with
both hands pointing it at Garcia, but she “didn’t think he was going to shoot because we
had walked away.” She saw Garcia get shot. When Garcia saw that Gallardo was also
shot, he was about to turn around. She told the jury, “I know I was shot but it shot him, and
then, again it was like, it was like it got me, too.” Gallardo saw Garcia drop the tire tool,
turn around, get shot in the back, and fall on the street. Afraid to get shot again, Gallardo
tried to help Garcia by going to houses for help “but nobody wanted to get near him.”


 
Chavez, who had been behind a nearby truck that was hit by a bullet, closed the door to
his residence.  
          The bullet entered Gallardo's lower back and exited her front side, resulting in her
hospitalization for about twenty-four days. Gallardo underwent three surgeries because
her intestines were perforated. An additional surgery to remove a colostomy bag was to
be scheduled when her body was stronger, to avoid shock. She took medication for
anxiety attacks and pain. Medical reports admitted in evidence showed Gallardo tested
positive for cocaine on August 5, 2000.
          Gallardo testified she married Garcia in February 2000. Recently released from
prison, Garcia had “a hard life in the past” and was trying to make a good life for himself. 
She and Garcia had joined the Christian Church and were working with its local leader. 
She was not aware Garcia was using cocaine and said, “[h]e was asking for help to keep
him from that. That’s the reason we went to [the church leader].” Gallardo conceded that
Garcia was not an outstanding, law-abiding citizen in the community. 
          At trial, Texas Ranger Rodolfo Jaramillo testified that he interviewed Elizondo at the
community center near the police department for about an hour after his arrest.


 During
the interview, Jaramillo asked Elizondo why he did not just scare Garcia. Elizondo
responded that he did not try to scare Garcia; he meant to kill him.


 Jaramillo asked
Elizondo to make sure what he meant by the phrase “lo quebre," and Elizondo responded,
“I meant to kill.”


 
          According to Jaramillo, Elizondo stated that he had taken a route to Tampico Street
in a manner to avoid driving in front of Garcia’s house. Once on the driveway on Tampico
Street, he was inside the property, inside the fence line. Elizondo saw Garcia coming
towards him. Elizondo took the gun from under the car seat and put it inside his waistband. 
Garcia was approximately twenty yards away.


 Elizondo waited for Garcia to get closer.
Elizondo pulled out the gun when Garcia was close enough and shot Garcia. Elizondo
gave no warning shots. He did not tell Garcia that he had a gun. According to Jaramillo,
Elizondo's demeanor conveyed that he had wanted to kill Garcia. When asked why he
shot Gallardo, Elizondo responded that he did not know, and that maybe she got in the
way. Elizondo demonstrated that he fired in a certain manner, and did not look where he
was shooting. Jaramillo testified that Elizondo admitted walking to the curb. In his
statement, Elizondo said he saw Garcia running toward him, but because of his poor
vision, he did not know if Garcia had a shotgun. Elizondo also stated there were prior
altercations between he and Garcia. Jaramillo testified that during the interview, Elizondo
showed remorse and said he had just wanted to go get his girls on the date of the shooting. 
Elizondo told Jaramillo, “[l]o quebre,” because Elizondo had been previously assaulted
and had his life threatened.
          Jaramillo understood that Elizondo was waiting to ambush Garcia. No handguns
were found at the scene. Rudy Chavez, a neighbor who lived across the street from
Garcia, hid behind a truck that was hit by a bullet. Other witnesses said Elizondo was
outside of the property by the curb and shot in an angle at Garcia. 
          During cross-examination, Jaramillo testified that Margarita Vasquez said she saw
both Garcia and Gallardo running from 925 West Tampico after shots were fired. On
cross-examination, Jaramillo agreed that: (1) Elizondo avoided Garcia by driving the
distance around a nearby pony-league park; (2) Garcia asked another witness, “Isn’t that
Rafael Elizondo?” (3) Garcia was looking for Elizondo; (4) Garcia then stopped a
conversation he was having and took the tire tool from the truck; (5) some witnesses said
Garcia was running toward 925 Tampico and asked for help to go “kick his [expletive];” (6)
witnesses saw Gallardo running after Garcia; (7) Jaramillo had information that Anna
Martinez told Garcia and Gallardo, “Leave us alone;” (8) Jaramillo had no credible
evidence that Elizondo changed positions before he shot; (9) Garcia could have been as
close as five feet from Elizondo; (10) the distance Elizondo indicated between he and
Garcia could have been less than the estimated twenty yards; (11) Jaramillo was told
Garcia had attempted to hurt Elizondo before; (12) Elizondo told him that he thought
Garcia had a shotgun; and, (13) when Elizondo told Jaramillo, "[l]o quebre," Elizondo said
at the same time that he had been assaulted and his life threatened. Jaramillo testified
that he investigated whether an item was removed from Garcia and found nothing. 
B. Prior Confrontations Between Elizondo and Garcia
          In addition to the evidence about the shooting, the record reveals several prior
confrontations between Garcia and Elizondo. The evidence showed Garcia was a member
of one cadre and Elizondo was a member of another. 
          On cross-examination, Martinez testified that neither she nor Elizondo called the
police when Garcia previously threatened Elizondo. She explained that the local police
were not quick to respond when needed, and she did not like to be involved too much with
them. She testified she did not know she could file a police report and a complaint. She
believed that filing a police report meant calling the police, waiting for them to arrive, and
letting them know what happened. After the shooting, Elizondo and Martinez did not
contact law enforcement because they were scared. 
          Martinez’s brother-in-law, Jesus Carbajal,


 lived at 925 West Tampico, where the
shooting occurred, but was not there when it happened. Carbajal testified that he heard
Garcia tell Elizondo he did not want to see Elizondo “on our street, in our neighborhood.” 
According to Carbajal, Garcia told Elizondo he was going to "kill him in the street like a
dog.” Carbajal added that Garcia made it known to him that he “did not care if he ran in
the house, he would go in there, and just take care of anybody that was in there.” When
Garcia made the statements, he did not have a gun, but Carbajal knew he had one. 
Carbajal explained that Garcia showed him the gun and wanted Carbajal to walk with him
around the block to talk. Garcia told him that if Carbajal was going to be Elizondo’s friend,
Garcia would do the same thing to him as he would do to Elizondo. Carbajal understood
the statement to be a threat that Garcia would shoot him, just as he threatened to shoot
Elizondo on sight. Carbajal testified that Garcia usually yelled his threats from “down the
street,” and Garcia had made the threats more than once. Carbajal had no doubt Garcia
would carry out his threats. After their talk, Carbajal and Garcia had “a mutual respect for
each other.” Carbajal testified that Garcia’s brother threatened his son, telling him to hurry
up and get home or he would shoot Carbajal. Although the police were called for the
incident involving his son, Carbajal testified he could not “be running to the police for every
little threat.” Carbajal did not know Elizondo had a gun. 
          Martinez’s sister, Maria Carbajal, testified that she worked as a prison guard and
had lived at 925 West Tampico Street for most of her life. At the time of the shooting, she
was on an errand for her parents. A few months before the shooting, she heard Garcia
threaten Elizondo. She recalled the incident in front of her house which “could have
escalated” to a physical confrontation. At her request, Elizondo ran inside her house. 
Garcia was a few houses down the street, yelling obscenities and threats at Elizondo,
including, “I’m going to kill you like a [expletive] dog in the streets.” Garcia never explained 
why he wanted to kill Elizondo, but it was clear he hated Elizondo. According to Maria
Carbajal, Garcia said it was his “barrio,” meaning his neighborhood, and he did not want
Elizondo in it. On the day of the threats, Maria Carbajal stood out in the street to make
sure Garcia did not come to her house. Garcia did not walk all the way to her house. 
Maria Carbajal stood in place to make sure nothing happened to “either person, or
anybody.” She was concerned for her children because Garcia had said he would kill
Elizondo or a witness–whoever was involved, whoever got in the way. She did not
remember whether Garcia was standing still when making the threats. 
          On cross-examination, Maria Carbajal testified she did not make a police report
because she had known the Garcia family all her life. She met Elizondo about nine months
before the shooting. They were neighbors and had known his family since she was young. 
She preferred to keep the peace in the neighborhood. She would tell Garcia to settle down
because if he went back to prison, it would break his mother’s heart. She gave the same
advice to Elizondo. She testified she never saw Elizondo with a weapon.
          Angela De Los Santos, Elizondo’s sister, testified she had problems with Garcia
after she lent her car to Elizondo. De Los Santos testified she was afraid of Garcia. After
Elizondo returned the car, Garcia mistakenly thought Elizondo was in the car when he was
not. Garcia followed De Los Santos to work several times and harassed her at the grocery
store. Later, Garcia did not threaten De Los Santos but Gallardo did. De Los Santos
related an incident in which she was pumping gas and Gallardo saw her. Gallardo told her,
“I’ll be right back” while stopped at a traffic light. While Gallardo turned into the parking lot, 
De Los Santos quit pumping gas and left because she was afraid “they were going to shoot
her or hurt her somehow.” On another occasion in July 2000, De Los Santos entered the
parking lot of the nursing home where she worked. De Los Santos heard Garcia tell
another man in a car approaching her car that De Los Santos was not Elizondo. 
Approximately two weeks later, Garcia again followed her on her way to work at night. De
Los Santos ran inside the building, looked outside, and saw Garcia looking into her car. 
In each incident, Garcia was in the same black car.
          On cross-examination, De Los Santos admitted her husband was in prison. She
admitted that during the month of July 2000, she visited the prosecutor and received
assistance but did not report these incidents involving Garcia. She testified that the threats
had not stopped and she remained afraid of Gallardo. 
          Gallardo denied she provoked either Elizondo or Martinez. She testified she did not
know Martinez but considered Elizondo “a friend." She “did not have anything against him
and he had nothing against her.” As to a wound on Garcia's neck, Gallardo testified it
occurred a month before his death and the incident involved Elizondo’s friends. Gallardo
testified Garcia also received a stab wound on his elbow two days before the shooting,
while she and Garcia were returning from church. Garcia did not want to press charges
because “he was afraid something could happen to us.” Garcia told police officers he did
not want to tell them who was involved because he was “afraid for us.” According to
Gallardo, Fernando Chihuahua


 “hurt” Garcia and Jason Garcia.


 She testified that 
“they” had told Garcia that they were going to kill him. Gallardo further testified that this
was not the first time Elizondo pulled a gun on Garcia.
          Detective Samuel Adame testified about a 1990 incident in which Garcia shot two
of the De Los Santos brothers with a shotgun in front of a convenience store. One of the
brothers was in the same cadre as Elizondo. Garcia was convicted and sentenced to
prison for the offense. 
C. The Investigation
          Police officer Ernesto Gomez, Jr. testified that he was the first officer at the scene
of the shooting on August 5, 2000, and was involved in the investigation. By the time he
reached the scene, Elizondo had enough time to leave the area and there had been
enough time for a weapon to be removed from Garcia's body. Gomez testified that
Elizondo was arrested on August 8, 2000, while a passenger in a vehicle involved in a
traffic stop. Elizondo fled on foot and when apprehended, said he had “nothing with” the
officers and that the shooting “was just a personal thing.” Gomez testified a tire tool could
be just as deadly as a revolver or a shotgun. 
          State trooper Andres Maldonado, an accident reconstructionist, testified that the
distance between the first blood stain on the street and the spot where Elizondo reportedly 
stood was 54.31 feet. The distance between the first blood stain and Garcia’s body was
88.22 feet. The distance between the body and where Elizondo reportedly stood was
142.54 feet. Although he did not measure the distance between Garcia’s body and the tire
tool, Maldonado estimated that distance to be ten feet.
          Detective Samuel Adame testified that no object other than the tire tool was found
at the scene. His investigation did not conclude that an object was removed from Garcia’s
body. Adame testified that Garcia was in possession of a tire tool at the scene, which was
“exculpatory evidence." He explained that Garcia “wanted to go over there and cause an
altercation with Mr. Elizondo.” Adame agreed that Garcia was closer to Elizondo than the
first blood stain on the street. He testified that the 54.32-foot distance would not mean
imminent danger. Adame testified that some witnesses told him four shots were fired and
one witness said five; however, he could account for only two. When asked if Elizondo had
acted to defend himself, Adame answered, “I wouldn’t call it a defense,” because Elizondo
“had other options.” He concluded, “[j]ust by seeing the gun, Garcia would have turned
and left.” Adame testified that the evidence showed Garcia traveled over 300 feet from his
house to where Elizondo stood. Adame testified that a tire tool is a deadly weapon, which
is defined to be “anything that can be used to cause serious injury or death.” 
D. Medical Examiner's Testimony
          Dr. Marguerite Cornwell, a staff pathologist, performed the autopsy. She ruled the
manner of Garcia's death was consistent with a homicide. She concluded Garcia suffered
a perforating,


 lethal gun shot wound to the chest. She testified that the bullet entered the
front left side of the chest and exited the body on the back, totally destroying the backside
and top of the heart.


 The bullet penetrated the chest, hit the left lung, hit the mid-heart,
and then hit the right lung. Dr. Cromwell explained that the bullet "was going left to right,
and it was very much on the same angle straight up and down through the chest cavity." 
          According to Dr. Cornwell, Garcia bled to death and died very quickly. Considering
the “open gaping wound to the heart” that he sustained, Dr. Cornwell concluded Garcia
might have “up to 30 seconds of continued movement . . . . You might have one or two
forward steps; but not much more than that.” When asked if the shot was from a gun fired
at close range, she responded that it was not, explaining close range means the gun is
probably within two feet of the body and medium range is up to eight feet; after that, the
range is indeterminate. 
          Dr. Cornwell testified that Garcia also had a bandaged stab wound on the left elbow
and another in the neck area and a superficial stab wound on the upper right buttock. The
wounds to the neck and buttock were healing. The elbow wound was a more recent
wound. Specimens from Garcia’s body tested positive for cocaine. Dr. Cornwell
concluded cocaine use was recent. She added, “[t]here could have been” whole cocaine
in his body from a very recent use “[a]nd by the time it’s analyzed,” it is already “broken
down.” The cocaine metabolite in his blood meant Garcia had used cocaine that day, “and
probably in a time frame of very close or near to death.” She testified that cocaine can
make a person agitated, euphoric, risk-taking, feel stronger, and can cause impaired
judgment. 
          Regarding Gallardo's injuries, Dr. Cornwell testified that part of Gallardo’s large 
intestine was removed during surgery. She concluded there was a bullet track with
through-and-through perforation of the bowel wall. She testified that the wound would have
been lethal if not treated, and that it was a serious bodily injury. 
          On cross-examination, Dr. Cornwell testified that Garcia was probably “turned a bit
on the diagonal” when shot. The trajectory of the bullet was such the bullet entered the
body at an angle. The bullet entered Garcia’s body at the same angle it exited. She
agreed that the blood on Garcia’s pants indicated he was in an upright position and there
was an opportunity for the blood to roll down his body; but it could also indicate that at the
time he was shot, “he is going to go forward.” She testified that Garcia could have been
shot closer than the first blood-stain mark on the street, traveled back, dripped blood, 
traveled some more, and then collapsed. The stab wounds on Garcia’s body did not
appear to have been inflicted at the same time as the lethal gun-shot wound.
          On re-cross, Dr. Cornwell testified that cocaine can make one person be more
combative while making another person paranoid and wanting to remove themselves from
the presence of others. She could not conclude from the bullet-entry pattern and its path
through the body that Garcia was going to throw something or that he saw something was
going to happen and began his retreat. 
III. SUFFICIENCY OF THE EVIDENCE
          We construe Elizondo's brief liberally, as we must, and conclude he raises both
legal and factual sufficiency challenges. See Tex. R. App. P. 38.9. In his first and second
issues, Elizondo argues that the evidence is legally and factually insufficient to sustain his
convictions for: (1) the murder of Garcia; and (2) the aggravated assault of Gallardo. In
a sub-issue, Elizondo also argues that the evidence was sufficient to support his self-defense theory. The State counters that the evidence is sufficient to convict Elizondo of
both offenses and that the State met its burden of persuasion regarding self-defense. 
  Standards of Review
1. Legal Sufficiency
          A legal-sufficiency challenge calls on us to review the relevant evidence in the light
most favorable to the verdict, and then determine whether a rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. Escamilla v. State,
143 S.W.3d 814, 817 (Tex. Crim. App. 2004) (citing Jackson v. Virginia, 443  U.S. 307, 319
(1979)); see also Swearingen v. State, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003) (en
banc); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000) (en banc). This standard
is meant to give "full play to the [jury's] responsibility fairly" to "draw reasonable inferences
from basic facts to ultimate facts." Sanders v. State, 119 S.W.3d 818, 820 (Tex. Crim.
App. 2003). We consider all the evidence that sustains the conviction, whether properly
or improperly admitted. Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001)
(citing Garcia v. State, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994) (en banc)). Similarly,
we consider all the evidence that sustains the conviction, whether submitted by the
prosecution or the defense, in determining the legal sufficiency of the evidence. King v.
State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); Cook v. State, 858 S.W.2d
467, 470 (Tex. Crim. App. 1993) (en banc). In this review, we are not to reevaluate the
weight and credibility of the evidence, but rather, we act only to ensure that the jury
reached a rational decision. Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993)
(en banc). 
          The legal sufficiency of the evidence is measured against the elements of the
offense as defined by a hypothetically correct jury charge for the case. Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997). This standard of legal sufficiency ensures that
a judgment of acquittal is reserved for those situations in which there is an actual failure
in the State’s proof of the crime, rather than a mere error in the jury charge submitted. Id. 
We then determine if any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319; Johnson, 23 S.W.3d at
7. 
          If we reverse a criminal case for legal insufficiency, we reform the judgment of
conviction to reflect conviction for a lesser offense only if a jury charge on the lesser
offense was either submitted or requested, but denied. Collier v. State, 999 S.W.2d 779,
782 (Tex. Crim. App. 1999). Otherwise, we vacate the judgment of conviction for legal
insufficiency and order a judgment of acquittal. Swearingen, 101 S.W.3d at 95. 
2. Factual Sufficiency
          We are constitutionally empowered to review the judgment of the trial court to
determine the factual sufficiency of the evidence used to establish the elements of the
offense with which Elizondo was charged. See Johnson, 23 S.W.3d at 6. The Texas
Court of Criminal Appeals has restated the factual sufficiency standard of review:
There is only one question to be answered in a factual sufficiency
review: Considering all of the evidence in a neutral light, was a jury rationally
justified in finding guilt beyond a reasonable doubt? However, there are two
ways in which the evidence may be insufficient. First, when considered by
itself, evidence supporting the verdict may be too weak to support the finding
of guilt beyond a reasonable doubt. Second, there may be both evidence
supporting the verdict and evidence contrary to the verdict. Weighing all the
evidence under this balancing scale, the contrary evidence may be strong
enough that the beyond-a-reasonable-doubt standard could not have been
met, so the guilty verdict should not stand. This standard acknowledges that
evidence of guilt can 'preponderate' in favor of conviction but still be
insufficient to prove the elements of the crime beyond a reasonable doubt. 
Stated another way, evidence supporting guilt can 'outweigh' the contrary
proof and still be factually insufficient under a beyond-a-reasonable-doubt
standard. 

Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004). A clearly wrong and
unjust verdict occurs where the jury's finding is "manifestly unjust," "shocks the
conscience," or "clearly demonstrates bias." Prible v. State, No. AP-74,487, 2005 Tex.
Crim. App. LEXIS 110, at *16-*17 (Tex. Crim. App. January 26, 2005) (designated for
publication). 
          When the State bears the burden of proof, the proof of guilt is factually insufficient
if it is so obviously weak as to indicate that a manifest injustice has occurred or if it is
greatly outweighed by contrary proof. Zuliani v. State, 97 S.W.3d 589, 593-94 (Tex. Crim.
App. 2003). In determining the factual sufficiency of the elements of the offense, we view
all the evidence neutrally, not through the prism of “the light most favorable to the
prosecution.” Johnson, 23 S.W.3d at 6-7 (citing Clewis v. State, 922 S.W.2d 126, 129
(Tex. Crim. App. 1996)). However, we approach a factual-sufficiency review with
appropriate deference to avoid substituting our judgment for that of the fact finder. Id. Our
evaluation should not intrude substantially on the fact finder’s role as the sole judge of the
weight and credibility given to witness testimony. Id. We must consider the most important
evidence that the appellant claims undermines the jury's verdict. Sims v. State, 99 S.W.3d
600, 603 (Tex. Crim. App. 2003).  
          We always remain aware of the fact finder’s role and unique position, a position we
are unable to occupy. Id. at 9. Exercise of our authority to disagree with the fact finder’s
determination is appropriate only when the record clearly indicates our intervention is
necessary to stop manifest injustice. Id. Otherwise, we accord due deference to the fact
finder’s determinations, particularly those concerning the weight and credibility of the
evidence. Id. Absent exceptional circumstances, issues of witness credibility are for the
jury, and we may not substitute our view of the credibility of a witness for the
constitutionally guaranteed jury determination. Id. 
          Every fact need not point directly and independently to the accused’s guilt. 
Vanderbilt v. State, 629 S.W.2d 709, 716 (Tex. Crim. App. 1981). A conclusion of guilt can
rest on the combined and cumulative force of all the incriminating circumstances. Id. We
reverse a judgment of conviction only if proof of guilt is so obviously weak and manifestly
unjust or the contrary evidence is so strong that the standard of proof beyond a reasonable
doubt could not have been met. Prible, 2005 Tex. Crim. App. LEXIS 110, at *16-*17. 
          In conducting a factual sufficiency review, we review all the evidence. Cain v. State,
958 S.W.2d 404, 408 (Tex. Crim. App. 1997). In the opinion, we “show our work” when we
consider and address the appellant’s main argument for urging insufficiency of the
evidence. See Tex. R. App. P. 47.1; Sims v. State, 99 S.W.3d at 603 ("A proper factual
sufficiency review must include a discussion of the most important and relevant evidence
that supports the appellant's complaint on appeal."). This practice benefits the parties,
maintains the integrity of the justice system, and improves appellate practice. Id. 
          If we reverse a criminal case for factual insufficiency, we vacate the judgment of
conviction. Clewis, 922 S.W.2d at 133-34. We remand for a new trial a criminal case
reversed for factual insufficiency so a second jury may have the chance to evaluate the
evidence. Swearingen, 101 S.W.3d at 97. 
3. Self-Defense
          A person is justified in using force against another when and to the degree he
reasonably believes the force is immediately necessary to protect himself against the
other's use or attempted use of unlawful force. Tex. Pen. Code Ann. § 9.31(a) (Vernon
2003); see also Gamble v. State, No. 01-03-00477-CR, 2005 Tex. App. LEXIS 338, at *4
(Tex. App.–Houston [1st Dist.] January 13, 2005, no pet.); Ward v. State, 143 S.W.3d 271,
272 (Tex. App.–Waco 2004, pet. ref'd). Special rules apply to the use of deadly force. See
Tex. Pen. Code Ann. § 9.31(d) (Vernon 2003). A person is justified in using deadly force
against another if: (1) he would be justified in using force against the other under section
9.31; (2) a reasonable person in the actor's situation would not have retreated; and (3)
when and to the degree he reasonably believes the deadly force is immediately necessary
to protect himself against the other's use or attempted use of deadly force. Tex. Pen. Code
Ann. § 9.32(a) (Vernon 2003); see also Tex. Pen. Code Ann. § 9.31(d) (Vernon 2003). 
Deadly force is a force intended to cause or is capable of causing, as used or intended to
be used, serious bodily injury or death. Tex. Pen. Code Ann. § 9.01 (Vernon 2003). 
"Reasonable belief" is defined as "a belief that would be held by an ordinary and prudent
man in the same circumstances as the actor." Tex. Pen. Code Ann. § 1.07(a)(42) (Vernon
Supp. 2004-05); see Fielder v. State, 756 S.W.2d 309, 319-20 (Tex. Crim. App. 1988). In
determining whether a defendant had a reasonable belief that action was immediately
necessary for his protection, the facts and the circumstances must be judged from the
viewpoint of the defendant alone. Juarez v. State, 886 S.W.2d 511, 514 (Tex.
App.–Houston [1st Dist.] 1994, pet. ref'd). The question of whether the conduct was
justifiable is not to be viewed in the light of later events, but by what the defendant
reasonably believed at the time. See id. 
          The Texas Penal Code justification for self-defense focuses on the existence of
some necessity, the circumstances under which the force was used, the degree of force
used, and the type of conduct against which the force was used. Kelley v. State, 968
S.W.2d 395, 399 (Tex. App.–Tyler 1998, no pet.). The amount of force used must be in
proportion to the force encountered. Id. Deadly force is not immediately necessary if a
reasonable person in the position of the defendant would use some available nondeadly
method of self-defense. Id. In such circumstances, a defendant's use of deadly force
would not be justified. Id. (citing Tex. Pen. Code Ann. § 9.32(a)(3) (Vernon 2003)); see
Frank v. State, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985); Juarez, 886 S.W.2d at 514. 
          The defendant has the burden of producing some evidence to support the claim of
self-defense. Zuliani, 97 S.W.3d at 594; see also Gamble, 2005 Tex. App. LEXIS 338, *8.
Once the defendant produces such evidence, the State has the burden of disproving the
defense beyond a reasonable doubt.


 Zuliani, 97 S.W.3d at 594; see also Gamble, 2005
Tex. App. LEXIS 338, at *8. In reviewing the legal sufficiency of the evidence relative to
self-defense, the reviewing court looks not to whether the State presented evidence that
refuted the defendant's self-defense evidence, but rather whether, after viewing all the
evidence in the light most favorable to the prosecution, any rational trier of fact could have
found beyond a reasonable doubt: (1) the essential elements of the offense; and (2)
against the defendant on the self-defense issue. See Gamble, 2005 Tex. App. LEXIS 338,
at *8 (citing Saxton v. State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc)). The
issue of self-defense is an issue of fact for jury determination. Jenkins v. State, 740
S.W.2d 435, 438 (Tex. Crim. App. 1983) (en banc). The credibility determination of the
defensive evidence is solely within the jury's province and the jury is free to accept or reject
the self-defense evidence. See Saxton, 804 S.W.2d at 914. When the jury finds the
defendant guilty, it implicitly finds against the defensive theory. Gamble, 2005 Tex. App.
LEXIS 338, at *4; see Jenkins, 740 S.W.2d at 438. 
          Thus, for legal sufficiency, after viewing all the evidence in the light most favorable
to the prosecution, the reviewing court determines whether any rational trier of fact could
have found against the appellant on the self-defense issue beyond a reasonable doubt. 
See Saxton, 804 S.W.2d at 914. We apply the Zuniga standard of review for factual
sufficiency to the rejection of a defendant's self-defense claim. Zuniga, 144 S.W.3d at
484-85; see Zuliani, 97 S.W.3d at 594. In conducting a factual sufficiency review where
the defendant has claimed self-defense, an appellate court may find that the jury's rejection
of the self-defense theory was not wrong and unjust. See Bumguardner v. State, 963
S.W.2d 171, 173 (Tex. App.–Waco 1998, pet. ref'd). 
4. General Verdict
          When the indictment alleges alternate theories of committing the same offense, it
is proper for the jury to be charged in the disjunctive and to return a general verdict of
guilty. Tex. Code Crim. Proc. Ann. art. 37.07, § 1(a) (Vernon Supp. 2004-05) (verdict must
be general); Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App.1991) (en banc). The
conviction will be upheld if the evidence is sufficient to support a finding of guilt under any
one of the theories submitted. Kitchens, 823 S.W.2d at 258; see Aguirre v. State, 732
S.W.2d 320, 326 (Tex. Crim. App. 1987) (en banc); Yandell v. State, 46 S.W.3d 357, 363
(Tex. App.–Austin 2001, pet. ref'd). 
B. The Law Applicable to the Sufficiency Analysis for Murder
1. The Hypothetically Correct Charge
          A hypothetically correct charge is one that accurately sets out the law, is authorized
by the indictment, does not unnecessarily increase the State’s burden of proof or restrict
its theories of liability, and adequately describes the particular offense proof. Malik, 953
S.W.2d at 240; Cano v. State, 3 S.W.3d 99, 105 (Tex. App. –Corpus Christi 1999, pet.
ref'd). A hypothetically correct jury charge would not simply quote from the controlling
statute. Gollihar v. State, 46 S.W.3d 243, 254 (Tex. Crim. App. 2001). Its scope is limited
by the statutory elements of the offense as modified by the charging instrument. See
Fuller v. State, 73 S.W.3d 250, 254 (Tex. Crim. App. 2002) (Keller, P.J., concurring)
(quoting Curry v. State, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000)). Malik flatly rejects
use of the jury charge actually given as a means of measuring sufficiency of the evidence. 
See Gollihar v. State, 46 S.W.3d 243, 252 (Tex. Crim. App. 2001). Malik controls
sufficiency of the evidence analysis even in the absence of alleged jury charge error.


 Id.
at 255. A hypothetically correct jury charge would include an instruction on self-defense.



2. The Elements of Murder–Penal Code Section 19.02(b)(1)
          Elizondo argues that the evidence shows that he shot in self-defense. Murder is a
"result of conduct" offense. Cook, 884 S.W.2d at 490. We must decide whether a rational
trier of fact could have found beyond a reasonable doubt that Elizondo intentionally or
knowingly caused the death of Garcia. Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon 2003). 
A person acts intentionally with respect to the result of his conduct when it is his conscious
objective or desire to cause the result. Tex. Pen. Code Ann. § 6.03(a) (Vernon 2003). A
person acts knowingly with respect to the result of his conduct when he is aware his
conduct is reasonably certain to cause the result. Id. at § 6.03(b). 
          Elizondo challenges the sufficiency of the evidence to prove the requisite culpable
mental state for murder, arguing he acted in self-defense. As is almost always the case,
Elizondo's intent must be established by circumstantial evidence. See Dillon v. State, 574
S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978). The jury may infer the requisite intent
from any facts which tend to prove its existence, including the acts, words, and conduct of
the accused, the method of committing the crime, and the nature of the wounds inflicted
on the victims. Manrique v. State, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (en banc). 
If a deadly weapon is used in a deadly manner, the inference is almost conclusive that the
defendant intended to kill. Adanandus v. State, 866 S.W.2d 210, 215 (Tex. Crim. App.
1993); see Bell v. State, 501 S.W.2d 137, 138 (Tex. Crim. App. 1973); Guerrero v. State,
655 S.W.2d 291, 292 (Tex. App.–Corpus Christi 1983, no writ). In fact, where a deadly
weapon is fired at close range and death results, the law presumes an intent to kill. 
Womble v. State, 618 S.W.2d 59, 64 (Tex. Crim. App. 1981). 
C. Analysis
1. Sufficiency of the Evidence–Murder
          The evidence shows a history of bad blood between Elizondo and Garcia. The word
on the street was that Garcia would kill Elizondo "like a dog on the street" if he saw
Elizondo. The threat extended to Tampico Street where Garcia lived and where Elizondo
traveled on the fateful day. With a gun in his vehicle, Elizondo arrived on Tampico Street
to pick up Martinez's daughters. To reach the location, Elizondo had taken a route
calculated to avoid Garcia's residence. Nevertheless, once on Tampico Street, Elizondo
saw Garcia at a distance. Elizondo exited his vehicle to open Martinez's door. Meanwhile,
Garcia ran toward him, wielding a tire tool. Because of his poor eyesight, Elizondo could
not tell what Garcia had in his hand. The evidence showed that Garcia said "clean hands"
as he approached Elizondo. Elizondo fired his gun. Garcia sustained a fatal bullet wound
to his left upper chest. The medical examiner testified that the bullet entered Garcia's
chest at an angle. She further testified that Garcia had traces of cocaine in his system. 
Garcia's wife, Gallardo, sustained a bullet to her left back hip. Evidence showed her
injuries were life-threatening.
          We have reviewed the record, as we must, under the appropriate standards for legal
and factual sufficiency reviews. See Jackson, 443 U.S. at 319; see also Zuniga, 144
S.W.3d at 484-85; Malik, 953 S.W.2d at 240; Adi v. State, 94 S.W.3d 124, 131 (Tex.
App.–Corpus Christi 2002, pet. ref'd). Viewing the evidence in the light most favorable to
the verdict, we conclude that a rational trier of fact could have found that the gun, as used
by Elizondo, was a deadly weapon. See Adanandus v. State, 866 S.W.2d at 215. Thus,
a jury could have found beyond a reasonable doubt that Elizondo intentionally and
knowingly caused the death of Garcia by shooting him with a gun. We conclude the
evidence was legally sufficient to sustain the murder conviction. See Sanders, 119 S.W.3d
at 820. 
          We are not required to conclude that the verdict was factually insupportable
because the evidence of guilt was not free of contradiction, and the credibility of witnesses
may have been subject to question. See Zuliani, 97 S.W.3d at 593-94. Those
circumstances merely create issues for the jury to resolve. Id. We will not reverse unless: 
(1) the evidence of Elizondo's guilt, taken alone, is too weak to support the finding of guilt
beyond a reasonable doubt; or (2) the contrary evidence is so strong that the standard of
proof beyond a reasonable doubt could not have been met. See Zuniga, 144 S.W.3d at
484-85. Viewing the relevant evidence in a neutral light, favoring neither the prosecution
nor the defense, and with appropriate deference to the jury’s credibility determinations, we
conclude that the evidence supporting the verdict is not too weak to support the jury's
finding of guilt beyond a reasonable doubt. Nor is the weight of the evidence contrary to
the verdict strong enough that the State could not have met its burden of proof. Id. We
conclude that the evidence is factually sufficient to support Elizondo's conviction. 
2. Sufficiency of the Evidence–Self Defense
           The evidence showed that Garcia, wielding a tire tool, ran toward Elizondo. 
Martinez, Elizondo's girlfriend, testified she saw Garcia had a black gun but did not recall
in which hand. Martinez heard Garcia tell Elizondo he was going to shoot him "like a dog." 
Martinez testified she heard Gallardo telling Garcia to kill Elizondo. Martinez's niece, V.C.,
similarly testified that she saw Garcia holding a tire tool and "something else." Garcia was
not doing anything with the tire tool. V.C. also testified that she heard Garcia say he was
going to kill Elizondo "like a dog in the street." She did not hear anyone else say anything. 
She saw Garcia "a little bit away" from Elizondo and later testified that the location where
Garcia fell was far from her residence. V.C. saw a neighbor take something from Garcia's
waistband after he fell. V.C. did not see whether the object was a gun.
          Gallardo testified that the word was that Elizondo was after her husband. Knowing
that "things had happened already," she followed Garcia and told him to go home to
"prevent anything from happening." Gallardo testified she saw Elizondo pick up the gun
and heard Garcia say "clean hands." Elizondo responded that he was not going to fight
with clean hands. Garcia turned Gallardo around. When she turned to see whether Garcia
was following her, she saw Elizondo pointing the gun but did not think he would shoot
because they had walked away. 
          According to Texas Ranger Jaramillo, Elizondo told him he did not try to scare
Garcia and meant to kill him. Elizondo told him that: (1) he saw Garcia coming toward
him; (2) Elizondo put the gun in his waistband after retrieving it from underneath the car
seat; (3) Garcia was approximately twenty yards away; (4) Elizondo waited for Garcia to
get closer and pulled out the gun; and (5) Elizondo shot without firing any warning shots. 
          Trooper Maldonado testified that the distance between the first blood stain on the
street and where Elizondo allegedly stood was 54.31 feet. The medical examiner, Dr.
Cornwell, testified that the bullet entered Garcia's body at an angle and was not fired at
close range. 
          Elizondo had the right to defend against a reasonable appearance and
apprehension of apparent danger to the same extent as against actual danger. Dyson v.
State, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984). However, use of deadly force is
justified only when retreat is unreasonable. See Frank, 688 S.W.2d at 868. As to the
requirement of retreat before using deadly force, the defendant is held to a standard of
reasonable conduct based on his or her reasonable fear of death or serious bodily injury,
viewed from the defendant's standpoint at the time. See Juarez, 886 S.W.2d at 514. Even
assuming that Elizondo was reasonable in believing that Garcia was threatening him with
deadly force, Elizondo adduced no evidence that he could not have retreated. After the
shooting, he fled by vehicle. Further, even assuming that Garcia was the aggressor,
Elizondo adduced no evidence to show the immediacy of the need to protect against
deadly force. Evidence showed that Garcia said "clean hands." Elizondo responded with
deadly force. Even if Elizondo feared for his life, he had the opportunity to retreat. More
importantly, evidence showed that Elizondo told Jaramillo that he intended to kill Garcia. 
Thus, the jury was free to determine that the degree of force Elizondo used to reciprocate
Garcia's hostility was more than immediately necessary to protect himself. The jury was
also free to resolve conflicts in testimony. See Mosley v. State, 983 S.W.2d 249, 254 (Tex.
Crim. App. 1998) (en banc) (questions concerning the credibility of witnesses and the
weight to be given their testimony are to be resolved by the trier of fact); see also Esquivel
v. State, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974). Evidence is not rendered
insufficient when conflicting evidence is introduced. Matchett v. State, 941 S.W.2d 922,
936 (Tex. Crim. App. 1996) (en banc). The reviewing court must assume that the fact
finder resolved the conflicts, including conflicting inferences, in favor of the verdict, and
must defer to that resolution. Id.
          Having examined all of the evidence in the light most favorable to the prosecution,
we conclude the jury could have found against Elizondo on the defensive issue beyond a
reasonable doubt. Saxton, 804 S.W.2d at 914. Having reviewed the evidence in a neutral
light, we conclude the evidence in support of the defense was not so strong that the
beyond-a-reasonable doubt standard for rejecting the defense could not have been met. 
See Zuniga, 144 S.W.3d at 484-85; Saxton, 804 S.W.2d at 914. Accordingly, we conclude
the evidence was both legally and factually sufficient to support the jury's implicit rejection
of Elizondo's claim of self-defense. 
          We now turn to Elizondo's sufficiency challenges to the aggravated assault
conviction.
 
 
3. The Law Applicable to the Sufficiency Analysis for Aggravated Assault
a. Elements of Aggravated Assault
          A person commits assault by intentionally, knowingly, or recklessly causing bodily
injury to another, including the person’s spouse. Tex. Pen. Code Ann. § 22.01(a)(1)
(Vernon 2004-05). The elements of aggravated assault are that a person commit assault
and either: (1) cause serious bodily injury to another; or (2) use or exhibit a deadly weapon
during the commission of the assault. Tex. Pen. Code Ann. § 22.02(a) (Vernon 2004-05);
Ferrel v. State, 55 S.W.3d 586, 589 (Tex. Crim. App. 2001). 
b. Definitions of Terms in the Assault Statute
          “Bodily injury” means physical pain, illness, or any impairment of physical condition. 
Tex. Pen. Code Ann. § 1.07(a)(8) (Vernon 2004-05); Nelson v. State, 612 S.W.2d 605, 607
(Tex. Crim. App. [Panel Op.] 1981). “Serious bodily injury” is bodily injury that creates a
substantial risk of death or causes death, serious permanent disfigurement, or protracted
loss or impairment of the function of any “bodily member or organ.” Tex. Pen. Code
Ann. § 1.07(a)(46) (Vernon 2004-05); Ferrel, 55 S.W.3d at 589. The State bears the
burden of showing that an assault caused serious bodily injury. Moore v. State, 739 
S.W.2d 347, 352 (Tex. Crim. App. 1987) (en banc). To show protracted loss of a “bodily
member or organ,” the State must show that the injuries were “either continuing, dragged
out, drawn out, elongated, extended, lengthened, lengthy, lingering, long, long-continued,
long-drawn, never-ending, ongoing, prolix, prolonged, or unending.” Moore, 739 S.W.2d at
352 (citing Burton, Legal Thesaurus 418 (1980 edition)); see also Webb v. State, 801
S.W.2d 529, 533 (Tex. Crim. App. 1990) (requiring evidence that injury, without surgery,
would have caused permanent disfigurement or protracted loss or impairment); Brown v.
State, 605 S.W.2d 572, 575 (Tex. Crim. App. 1980) (serious bodily injury found where
evidence showed disfiguration and impairment were permanent unless medical attention
was sought).
          “Deadly weapon” is defined as anything that in the manner of its use or intended use
is capable of causing death or serious bodily injury. Tex. Pen. Code Ann. § 1.07(a)(17)(B)
(Vernon 2004-05); Ferrel, 55 S.W.3d at 589. An object may be a deadly weapon by its
manner of use. See Adame v. State, 69 S.W.3d 581, 584 (Tex. Crim. App. 2002) (Meyers,
J., concurring). If an actor uses or intends to use an object in such a way that the object
is capable of causing death or serious bodily injury, it is a deadly weapon. Id. In
determining whether an object is a “deadly weapon," a jury may consider: (1) the physical
proximity between the alleged victim and the object; (2) any threats or words used by the
accused; (3) the size and shape of the object; (4) the potential of the object to inflict death
or serious injury; and (5) the manner in which the accused allegedly used the object. Id. 
No one factor is determinative. Id. Each case must be examined on its own facts. Id. 
Finally, the use of a deadly weapon during the commission of an assault does not create
an inference of serious bodily injury. Moore, 739 S.W.2d at 352. 
c. Analysis
          Elizondo asserts that the evidence was legally and factually insufficient to sustain
his conviction for the aggravated assault of Gallardo. In particular, he argues that there
was no evidence that Gallardo's wound could not have been caused by a richochet from
a nearby trailer. Elizondo does not assign self-defense error to the aggravated assault
charge. The State responds that the evidence was sufficient. 
          The jury returned a general verdict. Thus, the conviction will be upheld if the
evidence is sufficient to support a finding of guilt under any one of the theories submitted. 
Kitchens, 823 S.W.2d at 258; see Aguirre v. State, 732 S.W.2d at 326. The hypothetically
correct jury charge would instruct the jury that, to find Elizondo guilty of aggravated assault,
the trier of fact must find that Elizondo either: (1) intentionally, knowingly, or recklessly
caused serious bodily injury to Gallardo by shooting her with a gun; or (2) used or exhibited
a deadly weapon, that is, the gun, during the commission of the assault. We measure the
evidence accordingly.
          Gallardo witnessed Elizondo pointing a gun at Garcia. She saw Garcia get shot. A
bullet entered Gallardo's lower back and exited her front side, perforating her intestines. 
She underwent three surgeries and, at the time of trial, was awaiting another surgery to
remove a colostomy bag. Dr. Cornwell testified that the injury would have been lethal if not
treated, and was indicative of a serious bodily injury.
          Considering all the evidence that sustains the conviction measured against the
element of serious bodily injury as defined by the hypothetically correct jury charge for
aggravated assault, we conclude that a rational trier of fact could have found beyond a
reasonable doubt serious bodily injury to Gallardo . See Jackson, 443 U.S. at 319; Malik,
953 S.W.2d at 240. The evidence is legally sufficient. Furthermore, viewing all of the
evidence in a neutral light, we conclude: (1) that a rational trier of fact could have found
beyond a reasonable doubt that Gallardo suffered a serious bodily injury when Elizondo
shot her with a gun; and (2) the evidence supporting the verdict is not too weak to support
the jury's finding of guilt beyond a reasonable doubt; nor is the weight of the evidence
contrary to the verdict strong enough that the State could not have met its burden of proof. 
See Zuniga, 144 S.W.3d at 484-85. The evidence is factually sufficient. 
          We have found the evidence sufficient to support Elizondo's conviction under one
of the alternative methods for committing the offense of aggravated assault. See Kitchens,
823 S.W.2d at 258. Although it is unnecessary to our analysis, we further find that the
evidence is legally and factually sufficient for a rational trier of fact to conclude beyond a
reasonable doubt that the gun was, in the manner of its use, capable of causing death or
serious bodily injury. See Tex. Pen. Code Ann. § 1.07(a)(17)(b) (a deadly weapon is
anything that in the manner of its use is capable of causing death or serious bodily injury). 
Specific intent to kill may be inferred from the use of a deadly weapon. Adanandus, 866
S.W.2d at 215; Bell, 501 S.W.2d at 138; Guerrero, 655 S.W.2d at 292. 
4. Disposition
          We overrule Elizondo's first and second issues.
IV. ELIZONDO’S VIDEOTAPED STATEMENT
          Elizondo’s videotaped confession is the basis for his complaints in his third, fourth,
and seventh issues. By these three issues, Elizondo essentially contends that the trial
court erred in: (1) denying his motion to suppress the videotaped statement; (2) allowing
Ranger Jaramillo to testify regarding the context of Elizondo’s statement at trial; (3) not
enforcing its order that the State obtain a translation of the statement; (4) denying his
motion to testify free from impeachment during the course of the trial; and (5) denying his
motion for new trial. Because these issues assert error connected to Elizondo’s
videotaped confession, we consider them together.
A. Relevant Facts
          On January 29, 2001, defense counsel filed a motion to suppress Elizondo’s
statement


 alleging, in part, violations of article 38.22(3) of the Texas Code of Criminal
Procedure.


 At a pretrial hearing on February 2, 2001, the prosecutor informed the trial
court that “we have pretty much complied with all of his motions except the one motion
where he wants the . . . criminal record and everything we have on” the witnesses, and
announced that the State would start complying with the remaining request. The trial court
orally pronounced that it granted that request. 
                                          The next pretrial hearing was held April 6, 2001. A different trial judge announced,
“The judge said that the state was allowed ten days to comply with motions. Motions heard
and granted. Whatever motions were heard, the judge granted.”


 When asked which
motions were complained of, defense counsel responded, “[t]he motion for discovery of the
victim’s arrest and conviction records and evidence of aggressive conduct.” After argument
of counsel, the trial court addressed defense counsel: “You moved this court to order the
state to disclose all evidence in their possession, and I’m ordering them to disclose it to
you. It doesn’t say anything about giving you copies.” Defense counsel responded,
“Judge, in a motion for discovery, it’s my understanding they are to provide it. But if that’s
the ruling [of] the court, I will live with it.” Regarding the videotaped confession, defense
counsel asserted, “The other thing I would ask–and I know Mr. Guerra [prosecutor] has
already agreed to it, and I believe he is going to do it. But I want the record to reflect I’m
asking for that and I’m going to get a copy, not make an appointment and come and view
it in their office.” The trial court ruled, “You are entitled to that, his confession.” The trial
court asked about the pending motion to suppress, and the prosecutor and defense
counsel agreed that motion was normally heard at the time of trial.
          On April 12, 2001, defense counsel filed a motion to testify “during the course of the
trial” free from impeachment with prior convictions, requesting the trial court to: (1) “instruct
the prosecuting attorney not to mention, refer to or otherwise bring before the jury either
directly or indirectly” evidence of Elizondo’s prior convictions for burglary of a building and
felon-in-possession of a weapon without first obtaining a specific ruling from the court
outside the presence of the jury; and (2) allow Elizondo to testify during the guilt stage of
the trial free from impeachment with prior convictions, under rule 609(a) of the Texas Rules
of Evidence. Tex. R. Evid. 609(a). 
          On April 17, 2001, at the final pretrial hearing held immediately before trial began,
the trial court heard argument, considered and ruled on Elizondo’s rule 609 motion. The
trial court granted Elizondo’s motion, telling the prosecutor, “[W]hen you get to the point
to where you want to impeach the defendant after his testimony, you make it known to me,
and then I will consider this matter further and rule on it at that time.” Further, the trial court
stated: “What I would like to do is hear the testimony in the case, and also the defendant’s
testimony before ruling on the matter. Okay? That way I can better put it in context.”
          In that final pretrial hearing, the trial court also heard Elizondo’s motion to suppress
his videotaped confession. Defense counsel admitted he had received a copy of the
videotape on April 10, well below the twenty-day window mandated in article 38.22 of the
Texas Code of Criminal Procedure. The State responded that, since the beginning of his
involvement in the case, defense counsel had been provided several opportunities to view
the videotape before a copy was provided to him. Further, on two occasions, defense
counsel made appointments to view the videotape. The videotape was set up for viewing
once and defense counsel refused to see it. Defense counsel admitted he viewed the
videotape “prior to filing” the motion to suppress. The trial court ruled, “I’m going to
construe that making the tape available for viewing satisfies the ‘providing requirement’ of
the statute in that the tape was made available for viewing prior to the 20th day.” 
          After viewing the videotape, the trial court denied Elizondo’s motion to suppress and
stated the videotaped confession would be admitted. 
          The court next turned to the translation matter, and expressed its concern "that a
good part of it is in Spanish.” The court asked whether the jury would be given a
translation, and defense counsel objected to the State’s proffered interpreter. The trial
court ruled it would take up the matter of the translation up at the appropriate time, adding,
“And I think under the law the record has got to be made in English. I think it is going to
be necessary that there be a translation. But I will give further consideration at the
appropriate time.” 
          During the trial, the State offered the videotape in evidence. The defense noted the
“record on that,” and the trial court admitted the videotape. As the trial continued, the State
notified the trial court and the defense of its difficulty in securing an interpreter. After the
State closed, the trial court stated, “Counsel you all can, if you need to double check your
exhibits. If you need to reopen after you’ve closed, and you need to reopen to clean up
for exhibits, that will be understood that you can do that.” Then the trial court asked
defense counsel, “[A]nything further?” Defense counsel responded, “No, Your Honor. . .
. The defense closes.” 
          After the charge was read to the jury and the jury began deliberating, the videotape
issue resurfaced:
[DEFENSE COUNSEL]: On the matter of the videotape, let the record reflect
that the prosecution never brought an interpreter, nor a transcript of it that
was interpreted. 
 
THE COURT: The videotape was admitted in evidence, but it was never
given to the jury for their view. So, it will not be considered as admitted
before the jury. And if they would ask me for the videotape, I would not send
it back. What ultimately occurred is that Ranger Jaramillo ended up–as I
recall it–telling the jury what the verbal statements were, and that obviated
the need for the videotape.“ 
 
B. Motion for New Trial
1. Standard of Review
          A trial court’s ruling denying a motion for new trial is reviewed under an abuse of
discretion standard. Rodriguez v. State, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). We
do not substitute our judgment for that of the trial court but simply determine whether the
trial court’s decision was arbitrary and unreasonable. Id.
 2. Rule 609(a) Motion 
          The purpose of a motion in limine is to prevent the asking of prejudicial questions
and the making of prejudicial statements in the presence of the jury. Sims v. State, 816
S.W.2d 502, 504 (Tex. App.–Houston [1st Dist.] 1991, writ denied). A motion in limine
merely precludes reference to the subject of the motion without first obtaining a ruling on
the admissibility of those matters outside the presence of the jury. Id. Although overruling
a motion in limine may be error, it is never reversible error. Id. If a motion in limine is
improperly overruled, a judgment will not be reversed unless the questions or evidence
were asked or offered. Id. However, in order to preserve the right to complain on appeal,
a timely objection must be made when the question is asked or the evidence offered. Id. 
          The record shows that the trial court granted the relief Elizondo requested. The trial
court’s ruling shows that Elizondo prayed for an order requiring the prosecutor to approach
the bench, offer evidence out of the presence of the jury, and obtain a ruling before directly
or indirectly adducing evidence of Elizondo’s prior convictions. Although he testified during
the motion for new trial, Elizondo did not testify during trial. We conclude that Elizondo did
not preserve error as to his complaint that the trial court did not allow him to testify free
from impeachment because: (1) assuming Elizondo was dissatisfied with the trial court’s
granting the limine part of his motion, he did not re-urge that part of the motion or seek an
unconditional order to allow him to testify without impeachment as to his prior offenses
under Texas Rule of Appellate Procedure 33.1(a)(1), he did not obtain a ruling under
Texas Rule of Appellate Procedure 33.1(2). See Tex. R. App. P. 33.1(a)(1); and (2) Tex.
R. App. P. 33.1(2). 
          During the motion for new trial, the following colloquy occurred:
[Defense counsel]: Prior to trial, do you remember whether or not part of the
strategy for you to testify was dependent on whether the court would grant
you the defendant’s motion to testify free of impeachment?
[Elizondo]: Yes, sir.
[Defense counsel]: Do you recall whether or not that motion was ever ruled
on prior to the ending of the trial?
[Elizondo]: No, sir.
 
On this record, we conclude that the trial court granted the relief requested and to the
extent requested. 
3. Motion to Suppress the Videotaped Confession
a. Standard of Review
           Generally, a trial court's ruling on a motion to suppress is reviewed for an abuse of
discretion. Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). If the issue is one
of application of law to facts, and the ultimate resolution of that issue does not turn on an
evaluation of credibility and demeanor of a witness, then the reviewing court may review
that issue de novo. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (en
banc). 
b. Analysis
          In his seventh issue, Elizondo complains that, for the reasons asserted in his third
issue, he was denied a fair trial and is entitled to a new trial. In his third and fourth issues,
Elizondo asserts the trial court did not enforce the mandatory requirements of articles
38.22(3)(a)(5) and 38.30 of the Texas Code of Criminal Procedure, and therefore erred in
denying his motion to suppress his videotaped confession. In particular, Elizondo
complains the prosecution failed to timely provide a copy of the videotaped confession to
him, failed to have it translated from Spanish to English, and that he was therefore denied
a fair trial. Elizondo contends his confession should have been suppressed and that he
is entitled to a new trial.
          The State does not dispute that it did not deliver a copy of Elizondo’s videotaped
confession to defense counsel within the twenty-day window required in article 38.22(3)(1). 
Tex. Code Crim. Proc. Ann. 38.22(3)(1) (Vernon 2004-05). The State, however, asserts
that it made the videotape available to defense counsel on several occasions. 
(1). “Is provided” and Timeliness under 38.22
          Article 38.22(3)(a)(5) states that no oral statement of an accused made as a result
of custodial interrogation shall be admissible against the accused in a criminal proceeding
unless, in part, “not later than the 20th day before the date of the proceeding, the attorney
representing the defendant is provided with a true, complete, and accurate copy of all
recordings of the defendant made under this article.” See Tex. Code Crim. Proc. Ann.
art. 38.22(3)(a)(5) (Vernon 2004-05). 
          The word “provide” in section 3(a)(5) means to "make available or furnish." Lane
v. State, 933 S.W.2d 504, 516 (Tex. Crim. App. 1996) (en banc). The trial court ruled that
making the tape available for viewing satisfies the ‘providing requirement’ of the statute in
that the tape as made available for viewing prior to the 20th day. The trial court’s
interpretation of the statute is consistent with Lane. Next, we must determine whether the
State complied with the “20th day before the date of the proceeding” requirement in article
38.22(3)(a)(5). Defense counsel admitted he reviewed the videotape “prior to filing” the
motion to suppress. The motion to suppress was filed on January 29, 2001. The motion
to suppress was heard on April 17, 2001. We hold the trial court did not err in denying the
motion to suppress the videotape. 
 
 
(2). Article 38.30
          Article 38.30(a) provides for the appointment of an interpreter in a criminal
proceeding in which the accused does not understand and speak English. See Tex. Code
Crim. Proc. Ann. art. 38.30 (Vernon 2005). In Leal v. State, 782 S.W.2d 844 (Tex. Crim.
App. 1989) (en banc), the Court held that the safeguards of article 38.30 apply to criminal
proceedings involving a tape recording of a conversation in a foreign language, and that,
in the face of a proper motion or objection, an interpreter must be sworn to translate the
conversation. Id. at 849.  
          The jury did not view or hear Elizondo’s videotaped confession. Once the jury
began deliberating, the trial court withdrew the exhibit. The trial court’s withdrawal of the
exhibit was consistent with Elizondo’s request that it be suppressed and not shown to the
jury. The objection, if any, was untimely. See Tex. R. App. P. 33.1(a)(1). Elizondo did not
preserve error as to this issue. 
C. Harm
             Because Jaramillo testified regarding the context of Elizondo’s statement and the
trial court denied Elizondo’s motion to testify free from impeachment, Elizondo complains,
in essence, that the failure to translate the videotape harmed him because he was not able
to testify and refute Jaramillo’s testimony that he intended to “ambush” Garcia. Elizondo
also complains that because the trial court did not grant his motion to suppress in the first
place, he was left in the indefensible position of not having the videotape translated for the
jury and not being able to show it to the jury. 
          We have concluded Elizondo’s complaint that the videotape was not translated was
untimely and error was not preserved. We have also concluded that Elizondo did not
preserve his complaint regarding the motion to testify free from impeachment. Even if
Elizondo had preserved error, we conclude from this record that he was allowed ample
opportunity to cross-examine Jaramillo. 
          The videotape is not in the record before us. Assuming without deciding that
Elizondo complains his videotaped confession should have been translated so that it could
be admitted in evidence and played for the jury, we look to rule 103(a)(2) of the Texas
Rules of Evidence for instruction. Error may not be predicated upon a ruling which
excludes evidence unless: (1) a substantial right of the party is affected; and (2) in case
the ruling is one excluding evidence, the substance of the evidence was made known to
the court by offer, or was apparent from the context within which questions were asked. 
Tex. R. Evid. 103(a)(2). During trial, the court viewed the videotape in question, and, after
an evidentiary motion for new trial hearing, denied the motion for new trial. 
          In the motion for new trial hearing, Elizondo challenged Jaramillo’s conclusion that
he “ambushed” Garcia. Elizondo asserted that Jaramillo did not provide a fair interpret-
ation of the statement. The defense viewed the videotape well before Jaramillo testified



and did not object to unfair interpretations. The trial court viewed the videotape outside the
presence of the jury, and at the motion for new trial hearing recalled:
And my impression was that the defense had decided not to go forward with
the jury view of the videotape and the transcription because the defense was
better off with Jaramillo’s characterization. I mean, I just figured there was
something on the videotape that was more dangerous to the defendant than
what Jaramillo said.
 
          At the conclusion of the hearing, the trial court reserved ruling on the motion for new
trial until after it reviewed the videotape and the prosecutor’s transcription of it. Defense
counsel stated, “It's not going to effect [sic] him. Elizondo gave a statement to the court
for the purposes of the presentence investigation.” During the punishment phase of the
trial, the trial court read the letter, which is not a part of the record. The prosecutor argued,
“And as a matter of fact, on his own statement that he just submitted to the Court, he says,
‘I was all scared and I was standing there by my car with my gun waiting for Pablo.’ So this
was an ambush.” The Court said, “I think the jury believed this was an ambush.”
          During the motion for new trial hearing, Elizondo testified that he did not have a
choice to either retreat or not defend himself. He admitted telling Jaramillo he intended to
kill Garcia. On this record, we hold that beyond a reasonable doubt, error, if any, did not
contribute to Elizondo’s conviction. Tex. R. App. P. 44.2(a). 
D. Disposition
          Elizondo essentially complains that, because of errors associated with his
videotaped confession, his trial strategy was curtailed, resulting in an unfair trial. The trial
court’s denial of his motion for new trial was not arbitrary or unreasonable. We overrule
Elizondo’s third, fourth, and seventh issues. 
V. "THE RULE"
          In his fifth issue, Elizondo asserts that the trial court erred by allowing Texas Ranger
Rudy Jaramillo to remain in the courtroom during the trial after “the rule” was invoked. The
State responds that the trial court did not abuse its discretion by allowing the officer to
remain in the courtroom to assist the State in the presentation of its case.
A. Texas Rule of Evidence 614
          The purpose of the sequestration rule, commonly known as “the rule,” has two
purposes: (1) to prevent the testimony of one witness from influencing the testimony of
another; (see Ladd v. State, 3 S.W.3d 547, 566 n.13 (Tex. Crim. App. 1999)) and (2) in the
case of witnesses testifying for the same side, it enhances the jury's ability to detect
falsehood by exposing inconsistencies in their testimony. See Tell v. State, 908 S.W.2d
535, 540, (Tex. App.–Fort Worth 1995, no pet.). Sequestration minimizes witnesses
tailoring their testimony in response to that of other witnesses, and it prevents collusion
among witnesses testifying for the same side. See Gordon v. State, 796 S.W.2d 319, 323
(Tex. App.–Austin 1990, pet. ref'd.). Rule 614 of the Texas Rules of Evidence, the witness
sequestration rule, provides that, at the request of a party, the trial court shall order
witnesses excluded so that they cannot hear the testimony of other witnesses and the court
additionally may make the order of its own motion. Tex. R. Evid. 614. The trial court must
invoke the rule if requested to do so; the sequestration rule is no longer discretionary with
the trial court. Moore v. State, 882 S.W.2d 844, 848 (Tex. Crim. App. 1994) (en banc);
Phillips v. State, 64 S.W.3d 458, 459-60 (Tex. App.–Houston [1st Dist.] 2001, no pet.). 
However, under rule 614, three classes of prospective witnesses are exempt from
exclusion from the courtroom. Moore, 882 S.W.2d at 848. The trial court must exclude
witnesses under the rule upon the request of either party unless one of the expressed
exceptions or exemptions apply. See Kelley v. State, 817 S.W.2d 168, 171 (Tex.
App.–Austin 1991, pet. ref'd) (addressing former Texas Rule of Criminal Evidence 613). 
When the Rule is invoked, all parties should request the court to exempt any prospective
witnesses whose presence is essential to the presentation of the cause. See Drilex Sys.,
Inc. v. Flores, 1 S.W.3d 112, 117 (Tex. 1999). The party seeking an exception under the
rule has the burden of showing that one of the enumerated exemptions is met. Moore, 882
S.W.2d at 848. 
          One exemption applies to any person whose presence is shown by a party to be
essential to the presentation of the party’s cause. Tex. R. Evid. 614(3). The party seeking
an exemption from the rule must show that the witness sought to be exempted is
“essential” to the presentation of its cause. Tex. R. Evid. 614(3); Barnhill v. State, 779
S.W.2d 890, 892 (Tex. App.–Corpus Christi 1989, no pet.). In seeking an exemption, a
prosecutor’s conclusory statement to the court that it would be necessary and essential for
him to confer with a witness in the courtroom during the trial is not sufficient to sustain the
State’s burden. Kelley, 817 S.W.2d at 172. Witnesses found to be exempt are not placed
“under the rule.” See Tex. R. Evid. 614. 
B. Standard of Appellate Review
          We review a trial court’s decision under the essential presence exception to the
witness sequestration rule under an abuse of discretion standard. See Barnhill, 779
S.W.2d at 892. An abuse of discretion occurs when the trial court acts arbitrarily or
unreasonably without reference to any guiding rules or principles. Montgomery v. State,
810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc). In other words, an abuse of
discretion occurs only when the trial court’s decision is so clearly wrong as to lie outside
that zone within which reasonable persons might disagree. Id. at 391. Still, we need not
reverse if we determine that the error did not affect appellant's substantial rights. Tex. R.
App. P. 44.2(b); Ladd, 3 S.W.3d at 566. This means that, even if the trial court abused its
discretion, we need not reverse if, after examining the record as a whole, we have fair
assurance that the error did not influence the jury’s deliberations to the appellant’s
detriment, or had but a slight effect. Tex. R. App. P. 44.2; Barnhill 779 S.W.2d at 893. 
Furthermore, if we can uphold the trial court's decision on any theory applicable to the
case, we will do so. Metts v. State, 22 S.W.3d 544, 550 (Tex. App.–Fort Worth 2000, pet.
ref'd).
C. Relevant Facts
          During a pre-trial conference, the prosecutor requested that the court allow the
investigator, Texas Ranger Rudy Jaramillo, to sit with the prosecution and remain present
during the trial. Defense counsel’s objection was that Jaramillo was the investigating
officer: (1) involved in obtaining Elizondo’s statement; and (2) in charge of gathering all the
evidence and identifying and interviewing all the witnesses. Defense counsel added:
If we do allow him–and normally I would not have an objection–but then it
would defeat our right to have the rule being invoked. And I’m not saying
that I distrust Detective Jaramillo, but I don’t want to take that chance. I think
in this case he is a very critical witness, and the rule should apply to him.”
 
          The trial court referred to the rule and asked the State, “Why is Ranger Jaramillo
essential to the presentation of the prosecution’s case?” The prosecutor responded, “To
assist the prosecution in presenting its evidence, and also, because of any escape risk of
the defendant.” Defense counsel further objected, although he conceded there was
precedent that “approved the situation wherein an investigator with the DA’s office who led
the investigation of the case, and who assisted the prosecution in preparing the case was
exempted from the rule.” In response to the trial court's statement that: “I would be inclined
to exempt him,” Defense counsel offered further argument:
Your Honor, I understand that the practice has allowed it. I understand that
there has been situations where it has happened. I prosecuted many years
myself, and I used it many times. But what I am trying to point out to the
Court is, that Ranger Jaramillo is the one that made this case. So, not only
is he going to sit there, but he is also going to be a witness. In most of the
cases that I’ve been involved with where an investigator or a ranger sits, that
person is not a witness. That person simply collects information, gathers
documents and evidence, and so forth, and the prosecution uses that
evidence through other witnesses. 
So the person sitting next to the prosecutor is not absorbing the
theories of the case, the weaknesses of the case and doesn’t have an
opportunity to take the stand and aid the prosecution in their case. And in
this case, I wouldn’t want to put Ranger Jaramillo in that situation. I don’t
think that anybody should put Ranger Jaramillo in this case. Ranger
Jaramillo is a very likeable person, and I trust him, but I don’t think that it’s
fair to put him in a situation where he has worked on this case for six or eight
months, has gathered all of this information and is going to be our main
witness at the same time, and sitting on the prosecution’s side, hearing all
of the prosecution’s case and hearing all of the defense’s case, and be able
to get on the stand and get off the stand, and rebut. That’s the problem I
have.
The prosecutor responded that Jaramillo was not the chief witness; rather, he took the
photos of the crime scene and interviewed Elizondo. The prosecutor added, “I was going
to use Ranger Jaramillo to assist me in the measurements between the blood spatter in
the street, and the location of the victim where he was found, and how far away Rafael
Elizondo was when he shot the victim.” Defense counsel argued further that “when the
Court reviews the confession, the Court is going to see Ranger Jaramillo and Officer
Adame. . . . Jaramillo has about a 20 page report in his file, of all he did. All of the people
that he interviewed, all the statements he took, and so on. He is the main witness for the
State.” Again, the prosecutor denied it. The trial court said, “Well, it sounds like Ranger
Jaramillo is the man who led the investigation and it sounds like he is a crucial and a key
witness.” The trial court then ruled to exempt Jaramillo from the Rule.  
D. Analysis
          The prosecution sought and obtained a ruling on its request for exemption from the
rule during a pretrial proceeding, prior to the defense invoking the rule. There was “a
showing” by the State that Trooper Jaramillo, the witness sought to be exempted from the
rule, was essential to the presentation of its case. See Barnhill, 779 S.W.2d at 892. In
granting the exemption, the trial court reasoned that Jaramillo was a crucial and key
witness for the State. We conclude the prosecution showed Jaramillo’s presence was
essential to the presentation of its case. Thus, the trial court’s decision was not arbitrary
or unreasonable and without reference to any guiding rules or principles. Even if the trial
court abused its discretion without requiring the State to sufficiently meet the criteria
imposed by rule 614, we conclude Elizondo was not harmed by any such error. See
Kelley, 817 S.W.2d at 171. On this record, we have fair assurance that the trial court's
error did not influence the jury's deliberations to Elizondo's detriment or had but a slight
effect. Although Jaramillo heard the testimony of many other witnesses before he testified,
his testimony did not contradict or corroborate the testimony of the other witnesses. In
short, we can say with fair assurance that Jaramillo’s hearing the preceding testimony did
not materially affect his own testimony.
          We overrule Elizondo’s fifth issue.  
 
VI. EXCLUSION OF AUTOPSY PHOTOGRAPH
          In his sixth issue, Elizondo asserts that the trial court erred in excluding his proffered
exhibit: an autopsy photograph which irrefutably rebutted Gallardo’s testimony that Garcia
was shot in the back. In addition, Elizondo states the photograph would show he “shot
under an imminent threat which clearly contradicted Jaramillo’s testimony of murder tainted
by cowardice.”        
A. Standard of Review
          A trial court’s admission or exclusion of evidence is reviewed under an abuse-of-discretion standard. Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002); Salazar
v. State, 38 S.W.3d 141, 153-54 (Tex. Crim. App. 2001). A trial judge is given wide
discretion when deciding admissibility of photographs. Sonnier v. State, 913 S.W.2d 511,
518-19 (Tex. Crim. App.1995) (en banc). An abuse of discretion occurs when the trial
court acts arbitrarily or unreasonably, without reference to guiding rules or principles. 
Montgomery v. State, 810 S.W.2d at 380. In other words, an abuse of discretion occurs
only when the trial court's decision is so wrong as to lie outside that zone within which
reasonable persons might disagree. Id. A photograph is relevant if it has "any tendency
to make the existence of any fact that is of consequence to the determination of the action
more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. 
Rule 403 carries with it the presumption that relevant evidence will be more probative than
prejudicial. Jones v. State, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). The admission
or exclusion of photographs into evidence is within the discretion of the trial court and will
not be disturbed absent an abuse of that discretion. Wyatt v. State, 23 S.W.3d 18, 29
(Tex. Crim. App. 1993). Consequently, there must be a marked disparity between the
evidence's prejudice and its probative value before the rule 403 balancing test requires
exclusion. Jones, 944 S.W.2d at 652; see Legate v. State, 52 S.W.3d 797, 806 (Tex.
App.–San Antonio 2001, pet. ref'd.).
          When performing a rule 403 analysis, the trial court must consider factors affecting
probativeness and balance those factors against the tendency, if any, of the photographs
to encourage resolution of material issues on an inappropriate emotional basis. Salazar
v. State, 38 S.W.3d 141, 152 (Tex. Crim. App. 2001). When determining the proclivity of
pictures to spur emotional decision-making, the court should examine: (1) the number of
exhibits offered; (2) their gruesomeness; (3) their detail; (4) their size; (5) whether they are
black and white or color; and (6) whether they are close-up. Id. Additionally, relevant
criteria in determining whether the prejudicial effect of a piece of evidence substantially
outweighs the probative value include: (1) the fact that the ultimate issue was not seriously
contested by the opponent; (2) that the State had other convincing evidence to establish
the ultimate issue to which the evidence was relevant; (3) that the probative value of the
evidence was not, either alone or in combination with other evidence particularly
compelling; and (4) that the evidence was of such a nature that a jury instruction to
disregard it for any but its proffered purpose would not likely be efficacious. Id. 
B. Relevant Facts
          The black and white photograph, marked as defendant's exhibit 4, shows Garcia’s
tatooed, nude body on a steel examining table. A probe is inserted in the bullet wound on
the upper left side of Garcia’s chest. The defense first offered the picture during cross-examination of the medical examiner, Dr. Cornwell. Dr. Cornwell testified that the picture
showed “a probe that has been placed into the left chest wound area. But it has not been
forced through the body.” The State objected as to relevance, and the trial court reserved
its ruling. The defense re-offered the picture during cross-examination of Gallardo, who
testified Garcia was shot in the back. The State objected on relevancy grounds. The trial
court asked the prosecutor, “[D]oes the State agree or disagree with the proposition that
the entry wound was above the left nipple, and the exit wound was to a horizontal track and
found in the right back?” The State agreed. The trial court ruled that the photograph would
not be admitted, stating that “the issue as to any entry or exit is not in the case.”
C. Analysis
          The State did not contest that Garcia sustained a bullet wound to the front of his
body. Dr. Cornwell, the medical examiner, testified at length and in detail about the results
of the autopsy, including the location of the entry and exit wounds, the bullet’s path at an
angle through Garcia’s left lung, heart, and right lung before exiting at the back. The
medical examiner’s testimony comprised convincing evidence to establish Garcia was shot
in the front of the body. The picture’s probative value was not particularly compelling,
either alone or in combination with other evidence. The tatooing throughout Garcia’s body
more likely than not would inflame the minds of the jurors. We conclude that the trial
court’s exclusion of the photograph was within the zone of reasonable disagreement. 
Montgomery, 810 S.W.2d at 379. Thus, the trial court did not abuse its discretion in not
admitting the photograph in evidence. 
 
D. Harm
          Even assuming, without deciding, the trial court erred in not admitting the
photograph, we conclude the error, if any, was harmless. Tex. R. App. P. 44.2(b). If the
appellate record in a criminal case reveals constitutional error that is subject to harmless
error review, the appellate court must reverse a judgment of conviction or punishment,
unless the court determines beyond a reasonable doubt that the error did not contribute
to the conviction or punishment. Id. 
          Elizondo does not address harm. Evidence showed that Garcia had recently been
released from prison. He sustained a stab wound from a cadre member two days before
his death. Gallardo admitted Garcia was not an outstanding, law abiding citizen in the
community. In the past, Garcia threatened Elizondo to approach and Elizondo pointed a
gun at Garcia. Evidence reflected that Elizondo waited for Garcia, to shoot him, and
intended to kill him. The jury rejected Elizondo's self-defense claims. During the
punishment phase of the trial, the trial court considered the jury's verdict and Elizondo's
self-defense claim. The trial court assessed punishment at the lower end of the
punishment range, twenty-five years. We conclude beyond a reasonable doubt that the
exclusion of the photograph did not contribute to the conviction or punishment of Elizondo. 
We overrule Elizondo's seventh issue. 
 
 
 
VII. CONCLUSION
          Having overruled all of Elizondo's issues, we affirm the judgment of the trial court.
 
                                                                           ERRLINDA CASTILLO
                                                                           Justice
 
Concurring Memorandum Opinion by
Justices Yañez and Garza
 
Do not publish.
Tex. R. App. P. 47.2(b)
 
Memorandum Opinion delivered 
and filed this 12th day of May, 2005